COMMONWEALTH vs. ROBERT K. JONES.

Barnstable. December 12, 1979. — February 4, 1980.

Present: BROWN, GREANEY, & PERRETTA, JJ.

*Motor Vehicle*, Operation, Homicide, Citation for violation of motor vehicle law. *Practice, Criminal*, Duplicitous charges, Nolle prosequi, Examination of jurors, Argument by prosecutor. *Pleading, Criminal*, Complaint, Indictment. *Constitutional Law*, Double jeopardy. *Evidence*, Cross-examination, Insanity. *Witness*, Expert. *Insanity*. *Due Process of Law*, Severity of punishment.

The portion of G. L. c. 90, § 24G, which makes culpable the act of negligently operating a motor vehicle to endanger, did not impliedly repeal G. L. c. 265, § 13, which provides for punishment of the crime of manslaughter, or otherwise bar simultaneous indictments under both c. 90, § 24G, for dangerous driving causing death and c. 265, § 13, for manslaughter predicated on reckless operation of a motor vehicle. [106-107]

Where a defendant charged with manslaughter and vehicular homicide moved before trial to dismiss the vehicular homicide indictment on the ground that it was duplicitous of the manslaughter indictment, the judge properly exercised his discretion in denying the motion, in the absence of any showing before him that an election between the two charges was necessary for the protection of the defendant's substantial rights. [108]

At the trial of a defendant on duplicitous indictments charging manslaughter and vehicular homicide arising out of a single occurrence, the judge should have treated vehicular homicide as a lesser included offense within the manslaughter charge, but the imposition of concurrent sentences after conviction on both indictments rendered the duplicity issue moot. [108-109]

In a prosecution for vehicular homicide resulting from an accident which caused the immediate death of two persons and the death of a third person approximately two weeks later, there was no merit in the defendant's arguments that the indictment should have been dismissed (a) because a traffic citation given to him the day after the accident and a complaint issued two days after the accident were insufficient to notify him of the offenses with which he would be charged, where these documents were clearly sufficient for this purpose [109-111];

(b) because he received no traffic citation after the third death [111]; and (c) because a nolle prosequi of the first complaint occurred over his objection, in the absence of any showing that the nolle prosequi was entered under circumstances which would prevent the issuance of a new indictment [111-112].

At the trial of a police officer on indictments charging manslaughter, vehicular homicide, and driving to endanger, the judge acted within his discretion in declining to ask, in the form submitted to him, twenty-eight of twenty-nine questions which the defendant moved to have propounded individually to prospective jurors, and in his questioning the venire as a group, in the absence of either a showing by the defendant that individual questioning was required or any indication from the venire that the risk of a decision on extraneous grounds existed. [112-116] BROWN, J., concurring.

No substantial rights of the defendant in a criminal trial were abridged by the judge's limiting cross-examination of a neurosurgeon called as a witness by the Commonwealth, who had diagnosed the defendant's condition as "acute alcohol intoxication," where defense counsel, although permitted extensive cross-examination of the doctor, was precluded from asking questions by which he sought to establish that the doctor had not performed various tests on the defendant. [116-117]

Evidence at a criminal trial permitted a jury to conclude that the defendant was acutely intoxicated at the time of an accident, and they were not bound by testimony of the defendant's expert that the accident was the result of the defendant's dyssomnia, even in the absence of any expert testimony to the contrary for the Commonwealth. [117-118]

At the trial of a defendant on homicide charges resulting from a motor vehicle accident, the prosecutor's questioning of defense witnesses concerning alcoholism, to which the defendant did not object at trial, created no substantial risk of a miscarriage of justice. [118-119]

A prosecutor's urging, during closing argument, that the jury "give all drunks that choose to drive on our highways the message," while improper, was erased by prompt and complete curative instructions. [119]

A remark by a prosecutor, made in closing argument, without objection, that psychiatric testimony had been introduced "to confuse you," while improper, was not so prejudicial as to require reversal, where the judge's charge to the jury on the issue of criminal responsibility led them to focus on the relevant issues. [119-120]

General Laws c. 90, § 24G, in prescribing a penalty for vehicular homicide, did not violate a defendant's right to due process of law by fixing too severe a criminal penalty for conduct essentially tortious in nature. [120-121]

INDICTMENTS found and returned in the Superior Court on March 21, 1978.

The cases were tried before *Beaudreau, J.*

*Edward F. Fitzgerald (Daniel DelVecchio, Jr.,* with him) for the defendant.

*Don L. Carpenter,* Assistant District Attorney, for the Commonwealth.

GREANEY, J.  On July 16, 1977, at approximately 5:30 A.M. the defendant, an off duty Mansfield police officer, while driving his car on the mid-Cape highway in Barnstable, travelled in the wrong direction in the eastbound lane and collided head-on with an approaching van.  As a result of the collision, two people in the van were instantly killed and a third died on July 31, 1977.  Subsequent indictments charged the defendant with three counts of involuntary manslaughter (G. L. c. 265, § 13), three counts of vehicular homicide (G. L. c. 90, § 24G), and operating to endanger (G. L. c. 90, § 24[2][a]).  Prior to trial the defendant filed several motions to dismiss the manslaughter and vehicular homicide indictments on multiple grounds.  All the motions were denied.  At the trial the Commonwealth contended that the defendant was acutely intoxicated at the time of the accident.  The defendant presented evidence that he was not criminally responsible because he was suffering from stage four dyssomnia (sleepwalking) at the time of the accident.  He was convicted by a jury on all the counts of all the indictments and was sentenced to concurrent terms in a house of correction.[1]  His assignments of error concern the denial of the motions to dismiss and raise questions about the relationship between the statutory crime of homicide by motor vehicle and the crime of involuntary manslaughter predicated on the reckless operation of a motor vehicle.  Other assignments concern the procedures

---

[1] On the manslaughter and homicide by motor vehicle convictions, the defendant received concurrent two and one-half year terms.  On the operating to endanger conviction, the defendant was sentenced to a concurrent two-year term.  A single justice of this court stayed the sentences pending disposition of this appeal.

leading up to the indictments and events that occurred at the trial. We affirm the convictions.

## I. Procedural Questions.

A. *Implied repeal of the manslaughter statute.* The defendant first contends that the Legislature's insertion of G. L. c. 90, § 24G, by St. 1976, c. 227 (homicide by motor vehicle)[2] impliedly repealed the crime of involuntary manslaughter[3] arising out of reckless operation of a motor vehicle. In addressing this issue, both the Commonwealth and the defendant have provided us with pertinent portions of the statute's legislative history and brought to our attention appellate decisions from several other States dealing with the relationship between their respective vehicular homicide and manslaughter statutes.[4] However, in the view we take of this

[2] General Laws c. 90, § 24G, as so inserted, provides: "Whoever, upon any way or in any place to which the public has a right of access, or upon any way or in any place to which members of the public have access as invitees or licensees, operates a motor vehicle in violation of paragraph (a) of subdivision (1) of section twenty-four of chapter ninety [operating under the influence], or so operates a motor vehicle recklessly or negligently so that the lives or safety of the public might be endangered, and by any such operation so described causes the death of another person shall be guilty of homicide by a motor vehicle and shall be punished by imprisonment in a jail or house of correction for not less than thirty days nor more than two and one-half years, or by a fine of not less than three hundred nor more than three thousand dollars, or both."

[3] General Laws c. 265, § 13, as appearing in St. 1971, c. 426, provides in pertinent part: "Whoever commits manslaughter shall, except as hereinafter provided, be punished by imprisonment in the state prison for not more than twenty years or by a fine of not more than one thousand dollars and imprisonment in jail or a house of correction for not more than two and one half years."

[4] The decisions all turn on the particular wording and nuances of the vehicular homicide statutes involved. It would not be useful to summarize or discuss them except to note that in some cases implied repeal has been found while in other cases it has been determined that the two crimes are capable of coexistence. See generally *State* v. *Biddle,* 45 Del. 244 (1953); *State* v. *Morf,* 80 Ariz. 220 (1956); *State* v. *Davidson,* 78 Idaho 553 (1957); *State* v. *London,* 156 Me. 123 (1960) (implied repeal). Compare and contrast *McCreary* v. *State,* 371 So.2d 1024 (Fla. 1979), and *State* v. *Young,* 371 So.2d 1029 (Fla. 1979) (no implied repeal).

case, we need not decide the broader question whether those portions of G. L. c. 90, § 24G, which impose criminal responsibility for recklessly operating to endanger or operating under the influence of intoxicating liquor are so inconsistent with the gravamen of motor vehicle manslaughter as to effectively repeal the latter in part.

Under G. L. c. 90, § 24G, homicide by motor vehicle may be committed in any one of three ways. Two involve negligent or reckless operation of a motor vehicle; the third concerns operating under the influence of intoxicating liquor. The three ways are stated disjunctively and create separate and independent grounds for prosecution. The indictment returned in this case was framed exclusively under that portion of the statute which makes negligently operating to endanger culpable, and the defendant was prosecuted only on that theory. See *Commonwealth* v. *Burke*, 6 Mass. App. Ct. 697, 699-700 (1978) (the fact that the standards provided by § 24G are stated disjunctively indicates legislative intent that a finding of ordinary negligence will suffice to establish a violation of the statute). The defendant's prosecution on the manslaughter indictment was predicated on his wanton or reckless operation of a motor vehicle. See *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967) (involuntary manslaughter is an unintentionally caused homicide which occurs either in the commission of an unlawful act not amounting to a felony nor likely to cause death or by an act which involves such disregard of probable consequences to another as to constitute wanton or reckless conduct). It is apparent without extensive discussion that the portion of § 24G making negligently operating to endanger criminal is not inconsistent with or repugnant to the crime of involuntary manslaughter arising out of reckless operation of a motor vehicle. We accordingly hold that that portion of § 24G just described does not impliedly repeal G. L. c. 265, § 13, or otherwise bar simultaneous indictments under § 24G for dangerous driving causing death and under G. L. c. 265, § 13, for manslaughter predicated on reckless operation.

B. *Duplicitous charges.* One of the defendant's pretrial motions sought to dismiss the vehicular homicide indictment on the basis that it was duplicitous of the manslaughter indictment. The judge ruled that the c. 90, § 24G, offense was not a "lesser included" crime within the manslaughter charge and denied the motion. The motion was correctly denied but not for the reason stated. The crimes differ in degree and are not mutually exclusive. The Commonwealth in advance of trial could not have been compelled to choose between the two charges unless it was necessary for the protection of the substantial rights of the defendant. *Commonwealth* v. *Slavski*, 245 Mass. 405, 411-413 (1923). The record reveals that the defendant made no such showing in support of his motion. As a consequence, the judge's exercise of discretion in declining to force an election was proper and supported by a long line of cases permitting, in the absence of a firm demonstration of prejudice, the combination of several offenses for trial which can be proved by the same evidence or which arise from what is essentially one transaction. See *Commonwealth* v. *Rosenthal*, 211 Mass. 50, 54 (1912); *Commonwealth* v. *Maloney*, 348 Mass. 610, 613 (1965); *Commonwealth* v. *Blow*, 362 Mass. 196, 200 (1972); *Commonwealth* v. *Cruz*, 373 Mass. 676, 690-691 (1977). See now Mass.R.Crim.P. 9(d)(1)(2), 378 Mass. 860 (1979), and Reporters' notes thereto, Mass. Ann. Laws, Rules of Criminal Procedure at 132-137 (1979).

The defendant now argues, however, that he was exposed to "jeopardy" in the way the offenses were handled at trial by the judge's allowing both offenses to go to the jury under instructions which in substance permitted conviction on both if the elements of each were established beyond a reasonable doubt. The offenses at that stage of the trial were duplicitous. The realities of the offenses and the circumstances under which they occurred, involving a single accident leading to three deaths, were such that the manslaughter indictment in effect charged an aggravated form of vehicular homicide. See *Kuklis* v. *Commonwealth*, 361 Mass.

302, 306-309 (1972); *Costarelli* v. *Commonwealth*, 374 Mass. 677, 683-684 (1978); *Fadden* v. *Commonwealth*, 376 Mass. 604, 609-611 (1978). *Commonwealth* v. *Xiarhos*, 2 Mass. App. Ct. 225, 226-228 (1974). Compare *Commonwealth* v. *Maguire*, 313 Mass. 669, 672 (1943). As a consequence the judge should have treated the c. 90, § 24G, charge as a lesser included offense within the perimeter of the manslaughter charge and handled it accordingly.[5] However, the defendant's requested instructions did not raise the subject, no objections were made to the instructions given, and the motion concerning duplicity was not renewed at the close of the evidence. Furthermore, it is conceded that the defendant was only tried once and that he was sentenced to concurrent terms on all the offenses. The record does not support the defendant's speculative assertion that the jury might have been confused by possible overlap in the charges. In these circumstances, it has been consistently held that the jeopardy clause is implicated only where multiple consecutive punishments are imposed. *Kuklis* v. *Commonwealth, supra* at 307. *Commonwealth* v. *Tabor*, 376 Mass. 811, 825 (1978). See also *Green* v. *United States*, 274 F.2d 59, 61 (1st Cir. 1960), aff'd, 365 U.S. 301, 306 (1961); *Brown* v. *Ohio*, 432 U.S. 161, 169 n.7 (1977). The imposition of concurrent sentences on all the convictions effectively rendered the duplicity issue moot. See *Fadden* v. *Commonwealth, supra* at 610, and cases cited.

C. *Procedural preliminaries to the c. 90, § 24G, indictment.* On July 17, 1977, the day after the accident, the defendant was given a citation in the hospital which indicated that he would be charged with homicide by motor vehicle and driving to endanger for a double fatality caused by driv-

---

[5] The duplicity could have been cured by dismissing the c. 90, § 24G, indictment prior to submission of the case to the jury and instructing them that it was a lesser included offense under the manslaughter indictment. See generally *Commonwealth* v. *Leo*, 379 Mass. 34, 39-40 (1979). Other alternatives would include instructing the jury that they could convict on one or the other but not on both, or dismissing the c. 90, § 24G, charge prior to sentencing, if convictions were returned on both.

ing his car "west in the eastbound lane." On July 18, 1977, a complaint issued from the First District Court of Barnstable pursuant to that citation charging the defendant with a violation of c. 90, § 24G, in causing "the death of other persons." The third victim died approximately two weeks after the accident. On August 25, 1977, three new complaints, one for each death, were issued by the District Court for motor vehicle homicide. On December 12, 1977, over the defendant's objection, the original complaint was nol-prossed.[6] On March 21, 1978, a single indictment containing three counts for motor vehicle homicide was returned by the grand jury. In a series of attenuated arguments, the defendant claims that the vehicular homicide indictment should have been dismissed because (1) the original traffic citation and the first complaint were too vague to afford him adequate notice of the offense; (2) he received no traffic citation after the third death; (3) the nolle prosequi of the first complaint barred his indictment because it occurred over his objection and because the new complaints (that led to the indictment) were not preceded by the issuance of a traffic citation. All the arguments are meritless.

The purpose of the citation provisions contained in G. L. c. 90C, § 2,[7] is aimed in part at insuring that a motorist,

---

[6]The assistant district attorney caused the following notation to be entered on the complaint: "This complaint is hereby nolle pros'ed as a result of (1) a defect of substance contained within the complaint, and (2) subsequent multiple complaints of the same charge having been brought."

[7]General Laws c. 90C, § 2, as amended through St. 1968, c. 725, §§ 1-3, provides in pertinent part as follows: "Any police officer assigned to traffic enforcement duty shall, whether or not the offense occurs within his presence, record the occurrence of automobile law violations upon a citation, filling out the citation and each copy thereof as soon as possible and as completely as possible and indicating thereon whether a complaint shall be applied for, or whether a written warning shall be issued. Said police officer shall inform the offender of the violation and shall give the original of the citation to the alleged offender.

"A failure to give the original of the citation to the offender at the time and place of the violation shall constitute a defense in any trial for such offense, except where the violator could not have been stopped or where additional time was reasonably necessary to determine the nature of the violation or the identity of the offender or where the court finds that some

who has not been arrested, receives immediate notice of the c. 90 violations with which he is charged, and whether a complaint or merely a warning will issue. The statute is designed to prevent a situation in which the person cannot establish a defense due to his being charged with a violation long after it occurs. *Commonwealth* v. *Gorman,* 356 Mass. 355, 357-358 (1969). *Commonwealth* v. *Boos,* 357 Mass. 68, 70 (1970). The original citation issued to this defendant was clearly sufficient to notify him that he would be charged with homicide by motor vehicle and driving to endanger for a double fatality. Any indefiniteness in the first complaint caused by its reference to causing the death of "others" was not of the type which would prejudice his defense. *Commonwealth* v. *Grasso,* 375 Mass. 138, 139-140 (1978). *Commonwealth* v. *Clark,* 5 Mass. App. Ct. 673, 677-678 (1977), and cases cited. The first complaint adequately pleaded a statutory offense. When coupled with the citation, and the availability for clarification by discovery, it provided sufficient notice to the defendant of the offense with which he was charged. *Commonwealth* v. *Massad,* 242 Mass. 532, 533-534 (1922). *Commonwealth* v. *DiStasio,* 294 Mass. 273, 278 (1936). *Commonwealth* v. *Bracy,* 313 Mass. 121, 123 (1943).

The police were not required to issue another citation as a prerequisite to seeking an additional c. 90, § 24G, complaint for the death of the third victim. Such a result would exalt form over substance when a defendant has already been made aware of the probable results of his conduct through the receipt of a citation. Obviously time was needed to determine the nature of the third violation and the circumstances excused the need for a new citation. *Commonwealth* v. *Mullins,* 367 Mass. 733, 736 (1975). Contrast

circumstance, not inconsistent with the purpose of this section, namely, to cause violators of automobile law to be brought uniformly to justice, justifies the failure. In such case the automobile law violation shall be recorded upon a citation as soon as possible after such violation and the citation shall be delivered to the offender or mailed to him at his residential or mail address or to the address appearing on his license or registration."

*Commonwealth* v. *Shea,* 356 Mass. 358, 360 (1969), and *Commonwealth* v. *Clinton,* 374 Mass. 719, 720-721 (1978).

The defendant also was not harmed by the nolle prosequi. The nolle prosequi at the stage when it occurred in this case did not constitute an acquittal but only exempted the defendant from any further liability on the particular complaint involved. *Commonwealth* v. *Buck,* 285 Mass. 41, 45 (1933), and cases cited. *Commonwealth* v. *Rollins,* 354 Mass. 630, 632 (1968). The prosecutor has the absolute power to enter a nolle prosequi on a complaint prior to trial where no rights of the defendant are violated (*Commonwealth* v. *Brandano,* 359 Mass. 332, 335 [1971]), and, in the ordinary course, such action will not bar later complaints or indictments on the same charge. See now Mass.R.Crim.P. 16(a) & (b), 378 Mass. 885 (1979), and Reporters' notes thereto, Mass. Ann. Laws, Rules of Criminal Procedure at 339 (1979). Contrast *Commonwealth* v. *Benton,* 356 Mass. 447, 449 (1969). The defendant has not shown that the nolle prosequi was entered under circumstances which would prevent the issuance of a new indictment.

## II.   THE TRIAL.

A. *Examination of prospective jurors.* On the first day of the trial and before the empanelling of the jury, the defendant moved to have twenty-nine questions propounded to the prospective jurors "individually and outside the presence of other persons to be called" pursuant to G. L. c. 234, § 28, as amended through St. 1975, c. 335.[8] The

---

[8] "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead.

"For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations

questions were designed to probe juror attitudes about police officers, automobile accidents, use of alcohol, mental illness, the presumption of innocence, and the effect of criminal charges. They also sought inquiry about knowledge of the defendant and the effect on the jurors of pretrial publicity. The judge denied the motion except as to question number eleven.[9] He interrogated the venire as a group on the subjects described in the first paragraph of c. 234, § 28. He included additional questions concerning knowledge of the defendant, the seriousness of the accident, and feelings about police officers.[10] The defendant took an ex-

---

which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination may include a brief statement of the facts of the case, to the extent the facts are appropriate and relevant to the issue of such examination, and shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

[9] "The defendant, Robert K. Jones, is a police officer in the Town of Mansfield, Massachusetts. Are you aware of any feelings on your part about police officers that might prevent you from fairly or impartially hearing this case?"

[10] "Since the evidence in this case will also involve reference to and descriptions of a serious motor vehicle accident causing a loss of life or lives, is there any reason known to you why you will have strong personal feelings either positive or negative by such an event?

"The Defendant Robert K. Jones is a police officer in the Town of Mansfield, Massachusetts. Are you aware of any feelings on your part about police officers that might prevent you from fairly or impartially hearing this case?

"Do you or does any member of your family have any personal knowledge or opinion of the Defendant Robert K. Jones at the outset of this case?

"Do you have any prior knowledge either through newspapers, TV, radio or word of mouth concerning the facts or the principals involved in

ception *only* to the judge's denial of his motion with respect to posing the remaining twenty-eight questions.

There is no requirement under the first paragraph of G. L. c. 234, § 28, that a judge examine prospective jurors individually on the topics enumerated therein. This paragraph continues the longstanding Massachusetts practice which gives the trial judge broad discretion "whether to refine or improve on the subjects of . . . § 28, by going into more detail." *Commonwealth* v. *Harrison*, 368 Mass. 366, 371 (1975). *Commonwealth* v. *Lacy*, 371 Mass. 363, 373 (1976). As stated in *Commonwealth* v. *Harrison*, *supra* at 371, a trial judge has "a fair leeway in deciding how deep the probe should go, having in view the nature of the case as . . . [he or she] apprehends it at the start." See also *United States* v. *Desmarais*, 531 F.2d 632, 633 (1st Cir. 1976). Although the second paragraph of § 28 of c. 234 was amended by St. 1975, c. 335, to make individual examination mandatory in certain circumstances, there is nothing in the amendment which alters the prevailing practice with regard to the handling of the topics described in the first paragraph. No abuse of the judge's discretion has been shown in this case as to his questioning on the general topics or in his declining to ask several of the remaining twenty-eight questions. *Commonwealth* v. *Campbell*, 378 Mass. 680, 696 n.12 (1979).

The defendant argues that the selection of question 11 from the proffered list and the judge's action in asking it together with the substance of some of the other questions suggested by the defendant implied a finding that the jurors might indulge extraneous considerations so as to require individual questioning. The present second paragraph of G. L. c. 234, § 28, does not require individual quizzing unless and until it has been shown by a defendant that the

---

this case that would affect your judgment in viewing and weighing the evidence impartially?"

The voir dire was preceded by a description of the accident and the crimes charged and the usual identification of the defendant, the anticipated witnesses, and counsel.

jury are likely to be swayed by extraneous issues. The judge has discretion in deciding whether that preliminary foundation has been laid. The defendant failed to supply the judge with an affidavit or any hard facts to support his contention that the jurors might be predisposed or biased.[11] *Commonwealth* v. *Campbell, supra* at 696. See also *Commonwealth* v. *Pinckney,* 365 Mass. 70, 74 (1974); *Commonwealth* v. *Lumley,* 367 Mass. 213, 216 (1975); *Commonwealth* v. *Harrison,* 2 Mass. App. Ct. 775, 778-779, S.C. 368 Mass. 366 (1975). We see no abuse of that discretion in this case by collective inquiry of the jurors as to the existence of any possible animus towards police officers or other preconceptions in the absence of the groundwork called for by the statute. The motion invited such a procedure by requesting supplemental questioning, in the event of any affirmative answer, as to "the factual basis for your response." Without a positive ripple among the venire the judge could conclude that the risk of a decision on extraneous grounds had not been sufficiently demonstrated. See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 793 (1977) (focus of G. L. c. 234, § 28, second par., as amended in 1975, requires reason to suspect that a juror or jurors are not or may not be indifferent before individual questioning is required); *Commonwealth* v. *Campbell, supra* at 696 (individual examination not required under § 28 where defendants failed to show any substantial risk that cases would be decided on extraneous issues). See also *Commonwealth* v. *Corgain,* 5

---

[11] The defendant argues here that he was not given an adequate opportunity to be heard on the motion, and if he had been fully heard he would have been able to persuade the judge that individual questioning was required. At the juncture in the bench conference where the judge denied the motion and indicated he would ask only question eleven, defense counsel did nothing by way of an offer of proof or specific comment to make it known that he had any further information to convey to the judge on the subject. Defense counsel retired from the conference by taking an exception to the judge's refusal to ask any of the other questions and by requesting the judge to inquire about juror attitudes towards serious automobile accidents, which he did. The defendant has not made it appear that he had anything else which would have materially added to the judge's assessment of the motion.

Mass. App. Ct. 899, 900 (1977). The judge could also properly leave the mental responsibility issue for treatment in his final instructions where it was fully covered. The lack of an objection indicates to us that the defendant was satisfied at the critical time with the procedure followed in the selection of the jury.

B. *Cross-examination of the Commonwealth's expert.* The defendant argues that the judge unreasonably limited his cross-examination of Dr. Paul, a neurosurgeon called by the Commonwealth. This doctor had examined the defendant at the hospital after the accident to determine whether he had incurred a significant head injury. He testified without objection, that, based upon his examination of the defendant's mental and physical condition, he had uncovered nothing which indicated mental illness or a mental defect, and he diagnosed the defendant's condition as "acute alcohol intoxication." In the course of cross-examination, defense counsel sought to establish that the doctor had not performed various tests upon the defendant including "sleep deprivation tests . . . to determine whether he had any temporal lobe epilepsy equivalent of any kind." The judge confined the examination to "what he did do, not what he did not do" and suggested that the defendant use his own experts to cover the point.

It is clear from a reading of the transcript that this is in no sense a situation in which the defendant was denied a meaningful right or opportunity to cross-examine the doctor. Extensive cross-examination was permitted which established that the doctor took no notes of the defendant's background relative to the determination of mental diseases; that the doctor's primary concern was not to evaluate the defendant for mental illness; that the doctor did not order a complete neurological work-up; that no sleep deprivation tests were ordered; and, finally, that the doctor only spent about thirty minutes with the defendant during his examination. It is an established rule that "the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound

discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Commonwealth* v. *Smith,* 329 Mass. 477, 479 (1952). *Commonwealth* v. *Underwood,* 358 Mass. 506, 513 (1970). *Commonwealth* v. *Hall,* 369 Mass. 715, 731 (1976). Our review of the cross-examination of the doctor in its entirety reveals that no substantial rights of the defendant were abridged by the judge's exercise of his discretion in limiting certain areas of the inquiry and that the matters which defense counsel desired to bring to the jury's attention were adequately developed. Contrast *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980).

C. *Defendant's sanity.* The defendant argues that the Commonwealth failed to establish beyond a reasonable doubt that he was sane at the time of the accident. The defendant produced expert testimony that the accident was the result of the defendant's sleeplike state (dyssomnia) and not the result of his intoxication. The jury were not bound to believe the testimony of defendant's medical experts even if it was substantially uncontradicted. *Commonwealth* v. *Smith,* 357 Mass. 168, 178 (1970). Moreover, the Commonwealth was not required to present any expert psychiatric testimony to sustain its burden of proof that the defendant was sane (*Commonwealth* v. *Marshall,* 373 Mass. 65, 70-71 [1977], and cases cited), and the resolution of conflicting evidence on the issue was for the jury. *Chase* v. *Roy,* 363 Mass. 402, 407 (1973). *Samii* v. *Baystate Medical Center, Inc.,* 8 Mass. App. Ct. 911, 912 (1979). Even though expert testimony permits a finding of criminal irresponsibility, such a finding is not required in the absence of expert opinion to the contrary. *Commonwealth* v. *Ricard,* 355 Mass. 509, 514-515. The jury had before it sufficient evidence to conclude that the defendant was acutely intoxicated at the time of the accident, rather than mentally irresponsible. That evidence included the defendant's admission of heavy drinking,[12] a blood alcohol analysis reading

---

[12] The defendant testified to having consumed four beers and seven gin and tonics during the twenty-four-hour period preceding the accident.

of .277, medical opinions that he was intoxicated, testimony of witnesses who observed the operation of the defendant's motor vehicle prior to the accident, and testimony that an empty rum bottle (which was full prior to the defendant's departure for Cape Cod), was found in the car.

D. *Conduct of the prosecutor.* The defendant objects to certain questions asked by the prosecutor which he claims were designed to leave the jury with the impression that he was an alcoholic. He also claims that the prosecutor strayed into prejudicial closing argument.

(1) *Questions relating to alcoholism.*[13] The defendant made no objection to the inquiry now challenged as it unfolded or to the possible implication from it that he was an alcoholic. In the absence of an objection we consider only whether there is a substantial risk that a miscarriage of justice may have occurred. *Commonwealth* v. *Roberts,* 378 Mass. 116, 122-123 (1979). We find no such danger. The prosecutor was entitled to explore with the defendant's experts whether they had considered the possibility that a different disease caused his condition on the morning of the accident or accounted for his later test results. Questions as to the elimination of one medical theory and the adoption of

---

[13] The prosecutor asked Dr. David Hume, a defense witness: "What does the abbreviation S.G.O.T. mean?" "If I were to tell you . . . that it may have something to do with the liver, would that assist you at all as a chemist?" He asked the defendant: "Are you an alcoholic, Mr. Jones?" "Have you ever been tested for any liver diseases?" "Do you abuse alcohol at all, sir? . . . Do you remember going to the Hotel Madison in Vermont on an FBI National Academy Meeting? . . . Did some incident happen up there in reference to alcohol and you?"

The prosecutor asked Dr. Hartmann another defense witness: "What does the S.G.O.T. level mean to you as a doctor?" "Does that indicate something to do with the liver function?" "A high level would indicate some damage to the liver, is that correct? . . . But it could be the liver Doctor, correct?" "Now, taking that alcohol level and that S.G.O.T. level, you are telling the jury that you didn't order a medical, physical examination of Mr. Jones to determine whether or not you were dealing with an alcoholic?" "Would you be able to diagnose an alcoholic, Doctor?" "What are the delirium tremors [*sic*], Doctor? . . . And delirium tremors [*sic*] would be consistent with an alcoholic, correct?" "Is alcoholism, is that a mental disease or defect in your mind?"

another were relevant and proper for consideration by the jury. Moreover, there was before the jury sufficient independent evidence apart from the challenged questions to raise an issue as to the defendant's heavy drinking so as to make the effect of any marginally improper questions merely cumulative in nature.

(2) *Closing argument.* In his final argument the prosecutor stated that "there is a reason that psychiatrists were brought down here . . . that reason was to confuse you." He also told the jury to "come back and give [the defendant] the message and give all the drunks that choose to drive in our highways the message." No objection was made to the "confusion" statement. The "message" statement drew an objection. The judge immediately ordered it struck, instructed the jury to disregard it, advised them to concentrate solely on the evidence, and told them that the evidence came only from the witnesses and not from the arguments of counsel.

In both respects, the argument was improper. We continue to wonder why some prosecutors persist, by ill advised rhetoric and inflammatory remarks, in attempting to snatch defeat from the jaws of victory. In appropriate cases where the remarks render a fair trial unlikely, we will not hesitate to reverse. See *Commonwealth* v. *Villalobos,* 7 Mass. App. Ct. 905 (1979); *Commonwealth* v. *Ryan,* 8 Mass. App. Ct. 941 (1979). In this case we leave the verdicts intact because the "message" commentary was erased by prompt and complete curative instructions. *Commonwealth* v. *Borodine,* 371 Mass. 1, 11-12 (1976), cert. denied, 429 U.S. 1049 (1979). *Commonwealth* v. *Charles,* 4 Mass. App. Ct. 853, 854 (1976). *Commonwealth* v. *Grammo,* 8 Mass. App. Ct. 447, 457 (1979). As to the "confusion" statement, in addition to noting the lack of an objection, we have read the judge's charge on the responsibility issue with care. We are satisfied that the jury were not sidetracked on the responsibility question by the remarks and that they were led to focus on the relevant issues by the charge. Contrast *Commonwealth* v. *Shelley,* 374 Mass. 466, 469-470 (1978) (pros-

ecutor's remarks that defense psychiatrists were "bought" and were "mercenary soldiers" and "prostitutes"; their psychological tests were "well meaning ink-blot tests . . . mice . . . goblins" so prejudicially clouded responsibility issue as to warrant reversal).

E. *The statutory penalty.* The defendant's last contention is that G. L. c. 90, § 24G, violates his "constitutional right to due process of law,[14] and is contrary to accepted Anglo-American standards of jurisprudence in that it imposes severe criminal penalties upon a defendant upon proof of simple negligence resulting in the death of another." The nub of the argument is that the Legislature has fixed too severe a penalty for conduct which is essentially tortious in nature. The Legislature has great latitude in creating new crimes and in prescribing the penalties for them to vindicate the legitimate interests of society. *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health,* 348 Mass. 414, 422 (1965). *Commonwealth* v. *Morrow,* 363 Mass. 601, 610-611 (1973). *Commonwealth* v. *Racine,* 372 Mass. 631, 635-637 (1977). General Laws c. 90, § 24G, was obviously designed to create an intermediate crime for motor vehicle deaths between the misdemeanor of operating to endanger and the felony of involuntary manslaughter. It was enacted to address in part the spiralling rate of highway deaths caused by negligent, reckless and intoxicated drivers. The crime charged is sufficiently serious to merit a meaningful sanction. We are satisfied that the discretionary range of punishment prescribed by the Legislature in § 24G does not involve a penalty grossly disproportionate to the severity of the crime, or totally at odds with the evil sought to be remedied. See *Commonwealth* v. *Jackson,* 369 Mass. 904, 910 (1976). Indeed, the maximum penalty is only slightly more than the maxima already established for operating to endanger (G. L. c. 90, § 24[2][a]) and operating under the

---

[14] In *Commonwealth* v. *Burke,* 6 Mass. App. Ct. 697, 698-700 (1978), we held that c. 90, § 24G, does not offend against due process because it contains definite criteria for fixing criminal responsibility.

influence (G. L. c. 90, § 24[1][*a*]) — both of which permit jail terms of up to two years.

*Judgments affirmed.*

Brown, J. (concurring). Although I fully concur in the majority opinion, I think a few words of caution must be inserted as to the manner by which the newly worded statute ought to be construed where racial or ethnic biases are implicated in a case.

In view of the amendment to c. 234, § 28, by St. 1975, c. 335, which, as indicated at 114, *supra,* narrows the discretion of the trial judge by expanding the jury selection process in cases where any issue of bias may cloud the trial atmosphere, the question to my mind naturally arises, should some factors, such as race, weigh more heavily than others in the trial judge's determination to propound questions individually to prospective jurors.

I reiterate my view that in such circumstances racial prejudice ought to be judicially noticed. See *Commonwealth* v. *Williams,* 6 Mass. App. Ct. 923, 923-924 (1978) (Brown, J., concurring). See also *School Comm. of New Bedford* v. *Commissioner of Educ.,* 349 Mass. 410, 416 (1965).

Little need be said to show that racism still exists in the Commonwealth and that such systemic, if at times subtle, prejudice tends to cloud the trial of a member of a minority race. Judicial attentiveness to such tensions in the community which impair tolerance and, it must be said, open-mindedness, ought, therefore, perforce to result in an expansion of the jury selection process for minority defendants. This approach would make more meaningful a defendant's right effectively to cleanse the jury pool of attitudes which may diminish the opportunity to receive a fair and impartial trial.

It follows that with respect to those cases involving black or Hispanic people a denial of the defendant's request for individual juror interrogation where there is a minimal in-

dication of possible prejudice would be a ground for order-
ing a new trial. See and compare *Commonwealth* v.
*Dickerson*, 372 Mass. 783, 793 (1977), and *Commonwealth*
v. *Campbell*, 378 Mass. 680, 696 (1979), with *Com-
monwealth* v. *Williams*, *supra*.